370 So.2d 708 (1978)
Roy Frank CLEMENTS, alias
v.
STATE.
7 Div. 575.
Court of Criminal Appeals of Alabama.
May 16, 1978.
As Corrected On Denial of Rehearing July 7, 1978.
*709 Jack Floyd and James E. Hedgspeth, Jr. of Floyd, Keener & Cusimano, Rowan S. Bone and J. Edward Cunningham, Gadsden, for appellant.
William J. Baxley, Atty. Gen. and J. Anthony McLain, Asst. Atty. Gen., for the State.
TYSON, Judge.
Roy Frank Clements was indicted under Alabama's Death Penalty Statute (Act No. 213, General Acts of Alabama, 1975, Title 15, Sections 342(3)  342(11), Code of Alabama 1940, as amended)[1] for the robbery and first degree murder of one Dora Mae Ford. The jury found the appellant guilty as charged and fixed punishment at death. The trial court thereafter conducted a post-conviction hearing on the aggravating and mitigating circumstances as required by law.[2] The trial judge then pronounced judgment which left punishment at death by electrocution.
William O. Bragg, Coroner of Etowah County, testified that on November 8, 1976, he went to the residence of one Roy Malone in the Shady Grove Community. Bragg stated that he found the body of one Dora Mae Ford lying on the living room floor in the residence. According to Mr. Bragg, Mrs. Ford's head had been nearly severed from her body except for a two inch tract of flesh behind the neck which held the head intact with the body. The cause of her death was due to massive hemorrhage.
Mr. Marlin Corbett Bartlett testified that on November 8, 1976, around 3:00 p. m., he and his wife drove to the residence of Mr. Roy Malone for a visit. He indicated that they pulled in Mr. Malone's driveway and noticed a Ford pickup which belonged to one Gilbert Beck. Seeing the pickup in the driveway, Mr. Bartlett and his wife left.
Mr. Ted Malone stated that he was the son of now deceased Mr. Roy Malone. He indicated that on November 8, 1976, around 4:30 p. m., he went to his father's home. Mr. Malone related that he walked in the kitchen door and found a large puddle of blood on the floor. He stated that he found the deceased, Mrs. Dora Mae Ford, lying on the living room floor. He then telephoned the operator and asked her to get the police, which she did.
Mr. Don Longshore, an investigator with the Etowah County Sheriff's Department, testified that he, along with Arnold Hatley and Donald Wiggins, went to the home of appellant in Boaz, Alabama, around 7:00 p. m., on November 8, 1976. He stated that appellant's wife answered the door and they went inside. The appellant's wife went to the bathroom door and told appellant that some men wanted to talk with him. According to Mr. Longshore, he asked her to gather up the clothes that appellant wore that day, which she did. He stated that he advised the appellant of his "Miranda" *710 rights (R. p. 230) and placed him under arrest. The appellant was transported to the county jail where he signed a waiver of rights form. Mr. Longshore indicated there were no threats, coercion, intimidation, or inducement made or offered the appellant in order to obtain a statement or get his signature on the waiver of rights form. Mr. Longshore then related that the appellant made a statement which he, Longshore, wrote down and had appellant read over and then affix his signature thereto.[3]
Mr. Roy S. Hale, a member of the Etowah County rescue squad, testified that on November 9, 1976, he found a brown paper bag on Sand Mountain in Boaz, Alabama. He turned the paper bag over to Mr. Leslie Cox of the Etowah County Sheriff's Department.
Mr. Leslie Cox testified that the paper bag found by Mr. Hale contained a lady's pocketbook. He stated that he turned the items over to Mr. Don Longshore. Mr. Longshore was recalled to testify and he said that the bag also contained a Timex watch in addition to the pocketbook.
Mrs. Tessie Malone, the wife of Mr. Ted Malone, testified that the pocketbook found in the paper bag belonged to the deceased, Mrs. Dora Mae Ford. She stated that the value of the pocketbook was approximately ten dollars.
Mrs. Jenny James, the deceased's daughter-in-law, testified that she was with Mrs. Ford when she purchased the Timex watch, identified as State's Exhibit No. 10 (found in the brown paper bag). According to Mrs. James, the value of the watch was seven dollars.
Mrs. Mary Ann Thrasher, the appellant's mother-in-law, testified that on November 8, 1976, she was living with one Mr. Gilbert Beck. Mrs. Thrasher stated that on this date she and Mr. Beck went to the appellant's home at approximately noontime. She indicated that Mr. Beck and the appellant discussed going over to an old man's house and getting some money. She stated that the two of them left around 2:00 or 2:30 p. m. and did not return for approximately an hour and a half. According to Mrs. Thrasher, the two men mentioned that a yellow car drove up to the old man's residence and so they left. Mr. Beck further related again of going to the old man's house and getting some money.
Mrs. Thrasher stated that she and her daughter then went over to Gilbert Beck's trailer where she lived. Upon arrival there, Mr. Beck and the appellant were sitting at a table upon which lay a billfold and a purse. Mr. Beck took seventy dollars out of the purse and split the sum between her and her daughter (appellant's wife). Then, Mr. Beck, Mrs. Thrasher, her daughter and the appellant drove to Sand Mountain where Mr. Beck threw a paper sack containing the billfold and purse over a cliff. When they returned to the trailer, Mr. Beck burned the clothing he was wearing earlier that day.
On cross-examination, Mrs. Thrasher stated that Mr. Beck was sharpening a knife on a whetrock shortly before he and appellant left the second time. She also testified that Beck and appellant left both times that day in Mr. Beck's pickup truck.
Dr. Vann Pruitt, Jr., State Toxicologist, testified that he performed a post-mortem on the body of one Dora-Mae Ford. Dr. Pruitt stated that the results of the post-mortem showed a ". . . laceration in the neck that commenced slightly behind the left ear and ranged around the front of the neck, terminating on the right side of the neck that completely severed all of the musculature and the blood vessels within the neck" (R. p. 315). The cause of death was extensive and massive hemorrhage from the severing of the arteries and veins in the neck. Dr. Pruitt indicated that the laceration could have been caused by a bladed instrument of some type.
Mr. John Case, State Toxicologist, testified that he examined a pair of blue jeans, which had been identified as those the appellant had worn on November 8, 1976. He stated that two small blood stains were *711 found on the jeans. The stains were identified by Mr. Case as Group O, human blood. Also, he indicated that the deceased's blood group was type O.
On cross-examination, Mr. Case testified that several human hairs were taken from Mrs. Dora Mae Ford's hand. These hairs, according to Mr. Case, had been removed in a violent manner, but did not show any similarities to hair samples taken from appellant.
The appellant then made a motion to exclude the State's evidence, which was overruled.
The appellant testified that on November 8, 1976, Gilbert Beck and Mary Ann Thrasher came to his home around noon. He stated that Mr. Beck asked him to drive over to Mr. Malone's home with him to inquire about purchasing a puppy. The appellant agreed because he knew that Mr. Malone had some tin which he desired to purchase. En route to Mr. Malone's home, he related that Mr. Beck stated that Mr. Malone had some money and that he was thinking about taking some of it. Upon arrival, Mr. Malone was standing in the carport. Mr. Beck asked him about the puppy and Mr. Malone replied that he had gotten rid of them. Malone also told the appellant that he did not have any tin for sale, but he knew a Mr. Bloodworth who did. About this time, a yellow car drove up in the driveway and he and Mr. Beck left and returned to his home. The appellant said he took a nap and then went back over to Mr. Malone's house with Mr. Beck to find out where Mr. Bloodworth lived. Once again, he related that Mr. Beck mentioned getting some money from Mr. Malone. When they arrived, Mr. Malone asked them in, and they all went in the kitchen where they were joined by Mrs. Dora Mae Ford.[4] The appellant testified that Mr. Malone was standing by the sink, preparing some food for his dog when Mr. Beck grabbed him by the ankles and drug him to the floor. Mr. Malone hollered for Mrs. Ford to get a gun. Then the following occurred (R. pp. 358-360):
"Q. All right. What, if anything  Roy, when that happened, when he said `Miss Mae, get a gun,' what did you say or do?
"A. I got Miss Mae by the arm.
"Q. What did you say to her, if anything?
"A. I told her please don't get a gun.
"Q. All right, did you say anything to Beck?
"A. I told him to leave Mr. Malone alone.
"Q. All right, what did he do? What did he do?
"A. He cut him.
"Q. He cut him. When did you first see a knife?
"A. Then.
"Q. Where did he cut him? Where did he cut him, Roy? In the neck?
"A. (Witness indicating.)
"Q. In the neck?
"A. Yes, sir.
"Q. All right, when he cut him was there blood?
"A. Yes, sir.
"Q. What was Miss Mae doing?
"A. Screaming.
"Q. What did you do?
"A. I ran out the door.
"Q. There has been some evidence that you said  Were you sick?
"A. Yes, sir.
"Q. When you ran out the door where did you go?
"A. I run past the truck.
"Q. Roy, did you cut Mrs. Ford?
"A. No, sir.
"Q. Did you cut Mr. Malone?
"A. No, sir.
"Q. Did you have any part in doing it?
"A. No, sir.
"Q. All right, you say you ran out?
"A. Yes, sir.
"Q. Where did you go?
"A. Ran right past the truck.
"Q. All right. Then what did you do, if anything?
*712 "A. I turned around and got in the truck.
"Q. How long was it after you did that before you saw Gilbert Beck?
"A. Just seconds shortly. I don't know how long it was. It was real short.
"Q. All right, where did you see him?
"A. He come out of the door.
"Q. What, if anything, did he have in his hands?
"A. He had a purse and wallet.
"Q. Is that the purse right there?
"A. Yes, sir.
"Q. All right. Where were you seated in the truck?
"A. Passenger side.
"Q. Were you sick?
"A. Yes, sir.
"Q. Did Gilbert Beck have any blood on him?
"A. Yes, sir."
The appellant testified that he and Mr. Beck then returned to his trailer. At the trailer Mr. Beck poured gasoline over his bloody clothes and burned them. After burning his clothing, the appellant stated that he, his wife, Mr. Beck, and Mrs. Thrasher drove to Sand Mountain where Mr. Beck threw a brown paper sack off a cliff.

I
The appellant asserts that the Alabama Death Penalty Statute (Act No. 213, Acts of Alabama, 1975) is unconstitutional because the trial jury could not consider the aggravating or mitigating circumstances, thus the death penalty is mandatory and therefore violative of the Eighth and Fourteenth Amendments to the United States Constitution.
The constitutionality of the present Alabama Death Penalty Statute, supra, has been upheld by this court as against this same contention in the following cases: Jacobs v. State, Ala.Cr.App., 1977; and subsequently upheld in Jacobs v. State, Ala.Cr. App., 371 So.2d 429, remanded for further proceedings; Ritter & Evans III v. State, Ala.Cr.App., 361 So.2d 654; Cook v. State, Ala.Cr.App., 369 So.2d 1260, Ms. December 6, 1977; Wilson v. State, Ala.Cr.App., 371 So.2d 932; Beck v. State, Ala.Cr.App., 365 So.2d 985; and Williamson v. State, Ala.Cr. App., 370 So.2d 1054. The appellant has not asserted any additional grounds for invalidating the statute in question which this court has not previously considered, thus we adhere to the views heretofore expressed on this question.

II
The appellant contends that the Alabama Death Penalty Statute is unconstitutional in that it does not provide for comparative appellate review of sentencing.
Title 15, Section 382(10), Code of Alabama 1940 (Recompiled 1958), now Section 12-22-241, Code of Alabama 1975, provides as follows:

"Hearing and determination in appellate court.  In all cases of automatic appeals the appellate court may consider, at its discretion, any testimony that was seriously prejudicial to the rights of the appellant, and may reverse thereon even though no lawful objection or exception was made thereto. The appellate court shall consider all of the testimony and if upon such consideration is of opinion the verdict is so decidedly contrary to the great weight of the evidence as to be wrong and unjust and that upon the ground a new trial should be had, the court shall enter an order of reversal of the judgment and grant a new trial, though no motion to that effect was presented in the court below. (1943, p. 219, § 10, appvd. June 24, 1943.)"
As Judge Harris pointed out in Jacobs, supra, the Supreme Court of Alabama, in the past thirty-five years, has reviewed approximately ninety-five death cases and has reversed twenty-five of them for various reasons, including excessive punishment, and also where the verdict was contrary to the great preponderance of the evidence.
*713 This court in Evans and Ritter v. State, Ala.Cr.App., 361 So.2d 654, expressly pointed out that we would also weigh the aggravating and mitigating circumstances independently. Therefore, appellant's contention is without merit.

III
The appellant contends that the trial court erred in charging the jury on conspiracy, aiding and abetting, principal and accessory, and also in allowing the district attorney to make certain remarks in his opening statement and closing argument as to these matters.
This court, in Morton v. State, Ala.Cr. App., 338 So.2d 423, at 427, cert. denied, 338 So.2d 428, stated:
"The law in this State is well settled that when two or more persons, by prearrangement or on the spur of the moment, enter upon a common enterprise or adventure and a criminal offense is contemplated, then each is a co-conspirator, and if the purpose of such enterprise is carried out, each is guilty of the offense committed, whether he did any overt act or not. Positive testimony is not necessary to prove community of purpose. It is the duty of the jury to determine whether such exists, and the extent of it, from the conduct of the parties and the testimony in the case. Stokley v. State, 254 Ala. 534, 49 So.2d 284 (1950). Neither is the accused's presence at the scene of the crime necessary. All persons concerned in the commission of a felony, whether they directly commit the act, or aid or abet in its commission, though not present, must be tried and punished as principals. Title 14, § 14, Code of Alabama 1940; Mitchell v. State, 51 Ala.App. 411, 286 So.2d 85 (1973)."
Also, see Williamson, supra; Thigpen v. State, Ala.Cr.App., 355 So.2d 392, affirmed, Ala., 355 So.2d 400; and Jacobs, supra, where this court expressly upheld the trial court in instructing the jury on the law in these matters.

IV
The appellant contends that the trial court erred in overruling his motion to exclude the State's evidence in refusing to give the requested general affirmative charge and in denying his motion for a new trial because the State did not prove a prima facie case.
First, the appellant asserts that there was no evidence presented by the State which established that anything was taken from Mrs. Ford before she died. In Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962), the Alabama Supreme Court held that the fact that the victim was dead at the time the property was taken would not militate the crime of robbery if the intervening time between the murder and the taking formed a continuous chain of events. See also Baker v. State, Ala.Cr.App., 344 So.2d 547 (1977). In the instant case the intervening time, if any there be, formed a continuous chain of events.
Second, the appellant asserts that in order for a conviction of robbery to be sustained, a demand for property must be proven. The three essential elements of the crime of robbery are: (1) felonious intent, (2) force or putting in fear, and (3) the taking and carrying away of the personal property of another from his person or in his presence, with all three elements occurring in point of time. Baker, supra; Moore v. State, 57 Ala.App. 668, 331 So.2d 422; Crutcher v. State, 55 Ala.App. 469, 316 So.2d 716; Tarver v. State, 53 Ala.App. 661, 303 So.2d 161; Tunstill v. State, 33 Ala. App. 460, 34 So.2d 857, cert. denied, 250 Ala. 421, 34 So.2d 859.
A demand for personal property is not a required element of proof in order to make out a prima facie case of robbery. There was sufficient evidence presented by the State to enable the jury to find that the appellant did in fact rob the deceased, Miss Dora Mae Ford. Hence, the trial court's rulings are correct.
The appellant contends that the indictment under which he was convicted did not state a crime or an offense contrary to *714 the law for which he could be convicted and that said indictment was duplicitous.
The indictment under which the appellant was convicted reads as follows (R. p. 601) (Omitting formal parts):
"The Grand Jury of said County charges that before the finding of this Indictment, Roy Frank Clements, alias Roy F. Clements, alias Roy Clements, whose name to the Grand Jury is otherwise unknown than as stated, feloniously took one (1) lady's purse, of the value of $10.00; one (1) lady's Timex wrist watch, of the value of $6.95; one (1) coin purse, of the value of $2.95, and $ .34, lawful United States coins, of the value of $ .34, all of the aggregate value of $20.24, the property of Dora Mae Ford, from her person or in her presence, and against her will, by violence to her person, or by putting her in such fear as unwillingly to part with the same, and during the course of said robbery the said defendant did unlawfully and intentionally, and with malice aforethought, kill Dora Mae Ford, the victim of said robbery, by cutting the said Dora Mae Ford with a knife, contrary to law and against the peace and dignity of the State of Alabama."
The indictment did not, as appellant contends, charge him with two separate offenses in one count. Under Section 13-11-2, Code of Alabama 1975, the appellant was charged with the murder of Mrs. Dora Mae Ford, committed during the course of a robbery.[5] Although both the intentional killing and the robbery must be proven to sustain a conviction, such proof under the indictment constitutes one offense.
The appellant also assigns as error the trial judge's instructing the jury on the elements of first degree murder. According to appellant, the language in the statute speaks of an "intentional killing," not first degree murder. If this was error, it was harmless. Such charge to the jury can only be advantageous to appellant since second degree murder and first degree manslaughter are also intentional killings and the jury did not receive instructions as to either one of these two classes of homicide. Thus, there was a much greater burden of proof on the State than the statute itself required.

VI
The appellant next asserts that the Alabama Death Penalty Act is unconstitutional because it imposes on the trial judge the responsibility of "commuting the death sentence." He also asserts that such authority under Amendment 38 to the Constitution of Alabama 1901, and Article 5, Section 124, of said Constitution, specifically grants such authority only to the Governor.
This Court, speaking through Judge DeCarlo in Beck v. State, Ala.Cr.App., 365 So.2d 985 expressly answered this contention. In Beck, supra, Judge DeCarlo noted:
"Under our death penalty statute, the question of sentence is not considered until the determination of guilt is made by the jury at the guilt phase of the bifurcated hearing. Once the jury finds the defendant guilty of one of the aggravated offenses, it fixes the punishment at death. However, it is the trial judge, who, at a separate hearing, determines whether or not the defendant is to suffer death or life imprisonment without parole. The verdict of the jury is advisory only. No sentence exists until the pronouncement by the trial judge at the conclusion of the sentence hearing. It is for this reason the court cannot be said to be commuting a sentence of death imposed by the jury, but, in truth and in fact, it is sentencing the accused after a jury's finding of guilt.
"We note, however, that once this sentence has been imposed by the trial judge *715 at the sentencing hearing, it can be commuted by the governor of this State afterwards, at any time, even up to the time of execution.
"In view of the foregoing, we are of the opinion that Alabama's new death penalty statute is constitutionally sound under both the United States and the Alabama Constitutions."

VII
Finally, the appellant assigns as error the trial judge's stating to the jury in his oral charge that the appellant was charged with ". . . murder in the first degree under circumstances of aggravation" (R. p. 462). Also, the jury verdict card read (R. p. 465):
"THE COURT: (Reading) `We, the jury, find the defendant, Roy Frank Clements, guilty of first degree murder with aggravated circumstances as charged in the indictment, and we fix punishment at death. Grady B. Goss, Foreman.'"
In view of our opinion in Jacobs, supra, we find no error as to either of these matters.
After careful examination of this record, as required by law, most specifically where the death penalty is involved, we find that the procedures here mandated by the Alabama Statutes fully comport with constitutional demands of the Eighth and Fourteenth Amendments to the United States Constitution.
The judgment of conviction and sentence of death as to this appellant is in all respects
AFFIRMED.
HARRIS, P. J., and DeCARLO and BOWEN, JJ., concur.
BOOKOUT, J., dissents with opinion.
BOOKOUT, Judge, dissenting:
The trial court's oral charge to the jury was erroneous and properly objected to. The error was compounded by giving the jury an invalid form verdict which was then used by the jury.
This court's opinion in Jacobs, supra, is not authority for the instant holding which summarily accepts the trial court's charge and verdict as proper. In neither of the Jacobs cases was the form of the verdict challenged. Likewise, as pointed out in Jacobs, supra:
". . . Appellant did not reserve an exception to the oral charge of the Court. . . .
* * * * * *
"It has been firmly established by both this Court and the Supreme Court of Alabama that in the absence of an exception to the Court's oral charge nothing is presented for review on appeal. The rule applies with equal force under our Automatic Appeal Statute in death cases.. . ." (Citations omitted.)
This court also stated in the Jacobs case, supra, that no exceptions were reserved to the oral charge and no written instructions were requested by the defense. Therefore, neither of those cases, nor dicta contained therein, are authority for the holding of this court in Section VII of the instant opinion.
Prior to Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), several felonies carried a possible death penalty in Alabama, among which were: kidnapping for ransom (Title 14, § 7, Code of Ala. 1490); robbery (Title 14, § 415); rape (Title 14, § 395); carnal knowledge of a girl under twelve years of age (Title 14, § 398); nighttime burglary of an occupied dwelling (Title 14, § 85); setting off explosives near an inhabited dwelling, vessel, etc. (Title 14, § 123); and, of course, murder in the first degree (Title 14, §§ 314, 318).
*716 Since Furman and Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), it is apparent that the death penalty may not be imposed except in aggravated cases where a human life is taken. Thus, in felonies where the victim is not killed, such as rape as in Coker, supra, and in kidnapping, robbery, burglary, etc., the death penalty will not be available to the State. The legislature set about to reimpose the death penalty in certain aggravated offenses by enacting Act No. 213, Acts of Ala.1975, approved September 9, 1975, now § 13-11-1 through 13-11-9, Code of Ala.1975.
Section 13-11-2 enumerates the aggravated offenses for which the death penalty may now be imposed. It should be noted that the traditional non-murder capital felonies only become capital felonies once again by the aggravating circumstance "when the victim is intentionally killed by the defendant." Such aggravating circumstance is spelled out in each of the felonies set out in § 13-11-2(a), subsections (1), (2), (3), (4), (8), and (9).
The offenses of aggravated murder are set out in other, separate subsections of § 13-11-2(a). The offense of murder may be aggravated in several different ways, such as: the victim being a peace officer on duty; killing for pecuniary gain; where two or more individuals are killed; where the victim is a public official; etc. Thus the death penalty is not provided for in the traditional cases of first degree murder.
In the instant case, the appellant was indicted under § 13-11-2(a)(2), "Robbery. . . when the victim is intentionally killed by the defendant." (Emphasis supplied.) The offense is robbery, the aggravating circumstance is the intentional killing of the victim. The appellant was not indicted and tried for first degree murder as the trial court charged the jury. The jury should have been instructed on the elements of robbery and the definition of an "intentional killing." An "intentional killing" is not synonymous with the definition of first degree murder.
Thus acting under the court's erroneous instructions, the jury returned a verdict which was not responsive to the issues. Aiola v. State, 39 Ala.App. 215, 96 So.2d 816 (1957). When the jury returned the verdict of ". . . guilty of first degree murder with aggravated circumstances . . .," it found the appellant guilty of an offense not charged in the indictment. The appellant properly raised the issue in the trial court and on appeal, and therefore we are now faced with an issue which was not before us in the Jacobs cases. This court cannot properly allow a defendant to be deprived of life or liberty where we are clearly presented with the fact that the guilty verdict rests upon a crime not charged in the indictment. I therefore dissent.

APPENDIX 1
 IN THE CIRCUIT COURT OF
 ETOWAH COUNTY, ALABAMA
STATE OF ALABAMA *
VS. * CASE NO. 12749
ROY FRANK CLEMENTS *

DECREE
In accordance with law, the Court held a hearing on October 7, 1977 to determine whether or not the defendant would be sentenced to death in accordance with the verdict of the jury or be sentenced to life imprisonment without parole.
The defendant was present with his attorneys and evidence was presented and arguments advanced.
The Court finds from all the evidence and the jury's verdict that the defendant was guilty and is guilty of First Degree Murder committed during a robbery, in which the victim was intentionally killed. This capital felony has all the ingredients of First Degree Murder, and the jury was charged on *717 First Degree Murder with all its ingredients and elements.
Defendant claims that this capital felony was committed by another person and his participation was relatively minor. The Court does not feel that defendants actions in the prevention of the victim from getting a gun was a relatively minor participation.
Some evidence of domination by another person was presented, but this is not considered by the Court to be so substantial to overcome the aggravating circumstances.
The Court finds that this capital felony of First Degree Murder was committed while the defendant was engaged or was an accomplice in the commission of a robbery.
The court further finds that this capital felony was committed for pecuniary gain.
The Court further finds that this capital felony was especially heinous, atrocious and cruel.
The Court finds all these aggravating circumstances to be present and finds no reasons to change the verdict of the jury fixing the punishment at death.
DONE THIS THE 13 DAY OF OCTOBER, 1977.
 /s/James B. Ward
 CIRCUIT JUDGE

Appendix 2 to follow.
*718 
*719 
*720 
*721 

On Rehearing
TYSON, Judge.
Appellant's counsel presents this Court with a motion to expunge and correct certain statements made in its first opinion on rehearing. That opinion is withdrawn and the following is substituted in place thereof.
Appellant's counsel calls attention to the provisions of § 13-11-2(b), Code of Alabama 1975, which reads as follows:

*722 "Evidence of intent under this section shall not be supplied by the felony-murder doctrine."
Our consideration of the evidence in this cause and of the foregoing statute leads us to the firm conclusion that Roy Frank Clements was an active participant in the murder of Mrs. Dora Mae Ford, having twice gone to the Malone residence with Beck, having pursued Mrs. Ford inside the residence, and having otherwise participated in her murder.
While both Beck and Clements, each sought to place the blame on the other for the use of the pocketknife in slitting the throats of the victims, the evidence indicates that each actively participated.
In brief, this Court did not in its original consideration, and does not now, rely upon the felony-murder doctrine to imply evidence of intent in this cause. To the contrary, Clements' active participation in the Ford murder supplies the requisite intent for an intentional killing necessary under § 13-11-2(a), Code of Alabama 1975, which is the aggravated offense of robbery when the victim is intentionally killed by the defendant.
In addition to the foregoing, this Court has carefully considered all other assertions of error raised on rehearing, and we are of the opinion that these were properly treated in our original opinion.
OPINION CORRECTED AND EXTENDED, APPLICATION OVERRULED.
HARRIS, P. J., and DeCARLO and BOWEN, JJ., concur.
BOOKOUT, J., dissents.
BOOKOUT, Judge, dissenting:
I adhere to my original dissent in this cause. As to the issue addressed in the court's extended opinion on application for rehearing, I have additional comments.
The sole and simple reason why the Code does not allow the felony-murder doctrine to supply intent is because intent is not an element of the felony-murder doctrine. At common law, any homicide occurring during the commission of any felony made all participants guilty of murder whether the killing was intentional or not. Alabama's first degree murder statute, § 13-1-70, Code of Ala.1975, is a modification of the old common law. The felony-murder doctrine, by that section, applies only to homicides "committed in the perpetration of, or the attempt to perpetrate, any arson, rape, robbery or burglary." Intent to kill is not an element of that doctrine. Thus, that doctrine could hardly supply intent for the instant charge of "robbery or attempts thereof when the victim is intentionally killed by the defendant." Therefore, if the new capital felony statute is to be applied to accomplices, it must be by some other doctrine of the law.
Section 13-9-1, Code of Ala.1975 (formerly Title 14, § 14) states:
"The distinction between an accessory before the fact and a principal, between principals in the first and second degrees, in cases of felony, is abolished; and all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense or aid or abet in its commission, though not present, must hereafter be indicted, tried and punished as principals, as in the case of misdemeanors."
(Emphasis supplied.)
The accomplice statute has been applied to all felonies, both capital and non-capital, in the past. It has been applied to charge an accomplice as a principal likewise in cases where specific intent to commit a crime must be charged on the part of the principal. In order to convict an accomplice of murder pursuant to that statute, it has been necessary to show that the accomplice had a previous understanding to kill or injure the deceased, or had knowledge of the intent to kill on the part of the co-defendant. In Jordan v. State, 81 Ala. 20, 1 So. 577 (1887), the Supreme Court stated:
". . . When a particular intent or formed design is requisite to constitute an offense, knowledge of its existence, and a common purpose to perpetrate the offense, must be shown before a person *723 can be convicted of aiding and abetting. We so held on the former appeal.  Jordan v. The State, 79 Ala. 9; State v. Hildreth, 51 Amer.Dec. 369, and notes."
In Tanner v. State, 92 Ala. 1, 9 So. 613 (1890), the Court stated:
". . . The accomplice, as we have seen, is criminally responsible for acts which are the direct, proximate, natural result of the conspiracy formed. He is not responsible for any special act not within the scope of the common purpose, but grows out of the individual malice of the perpetrator.  1 Wharton Crim.Law, § 397."
Since the appellant cannot be brought within the purview of the new capital felony statute by way of the felony-murder doctrine, the only vehicle remaining is the accomplice statute. It is my opinion that the accomplice statute does bring an aider and abettor within the purview of the capital felony statute. Whether Clements was an aider and abettor must be determined from the evidence. Clements was the only witness as to what transpired during the commission of the crime in question. In my opinion, his testimony differs from the details of his participation as set out in the extended opinion on application for rehearing. The court cannot apply § 13-11-2(a)(2) by merely making the assertion that the accomplice was "an active participant in the crime" where intent is an essential element. I do believe the appellant is subject to the capital felony statute via the accomplice statute in the instant situation. He could be charged equally with Beck for the murder of Mrs. Ford even though he did not personally do the killing. Under the facts set out in the record, the jury could infer that Clements had reason to know before going to the residence that Beck was sharpening his knife for a killing should such become necessary to effect the planned robbery. Howell v. State, Ala.Cr.App., 339 So.2d 138 (1976).
The capital felony statute allows the trial judge to consider as an aggravating circumstance that "the capital felony was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, burglary, or kidnapping for ransom." It likewise allows the circuit judge to consider as a mitigating circumstance the fact that "the defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor." Those references within the capital felony statute, coupled with § 13-9-1, supra, (the accomplice statute), convinces me that Clements could be tried, convicted, and sentenced to death under the capital felony statute provided the jury was charged as to the correct statute and returned a valid verdict. However, I still adhere to my original dissent that the trial judge charged the jury as to the wrong offense, and the jury returned a verdict for an offense not charged in the indictment.
NOTES
[1] This Act is now 13-11-2 through 13-11-9, Code 1975.
[2] See Appendix 1 attached hereto.
[3] Appellant's confession in Appendix 2 attached hereto.
[4] Mrs. Ford, deceased, was Mr. Malone's housekeeper.
[5] Under this Code section, the accused is indicted for the crime of robbery with the "aggravating circumstance" of an intentional killing.