Robbery or attempts thereof when the victim is intentionally killed; sentence, death by electrocution.
Appellant was indicted for the intentional killing during the course of a robbery of Quenette Shehane. Ala. Code § 13-11-2 (a)(2) (1975). On appellant's motion, venue was transferred to the Mobile Circuit Court. On November 3, 1977, appellant was convicted and subsequently sentenced to death. On the authority of Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382,65 L.Ed.2d 392 (1980), and Beck v. State, 396 So.2d 645 (Ala. 1980), appellant's conviction was reversed and remanded for a new trial. Thomas v. State, 400 So.2d 435 (Ala.Cr.App.), cert.denied, 400 So.2d 435 (Ala. 1981). On May 19, 1981, appellant was again found guilty. The jury, after receiving evidence of aggravating and mitigating *Page 209 
circumstances, recommended a sentence of death. Subsequently, the trial court concurred in the jury's finding and sentenced appellant to death.[1] From that conviction appellant now appeals.
Curtis Eiland, the victim's uncle, identified her body at Cooper Green Hospital in Birmingham on December 21, 1976.
On December 21, 1976, Jefferson County Deputy Coroner Jack Parker was called to the 3800 block of Fourth Place West in Birmingham. Parker observed the victim lying about nine feet off the roadway in an area used for dumping garbage. There were numerous bruises and scrapes on the body, as well as what appeared to be a gunshot wound to the chest.
Coroner Jay Glass performed the autopsy. Four bullets were removed from the victim, three from the buttocks area, and one from the chest area. Parker received the projectiles from Glass and turned them over to evidence technician David Higgins.
Glass's external examination revealed six gunshot wounds to the victim. In addition to those noted by Parker, two other wounds were found in the area of the victim's left elbow.
The victim's fiance, Ramsey Lane, testified that he last saw his fiancee around 6:30 p.m. on December 20, 1976, at his fraternity house where they were to have dinner. The victim left the fraternity house to go buy some salad dressing and never returned. She drove her automobile, which contained all of her possessions, including a Sears portable black and white television. Lane identified the television and testified that he was with the victim when she bought the set from a local Sears store.
John Andrew Mays, a roommate of Jerry Lee Jones, testified that on December 20, 1976, he overheard Jones, appellant, and Edward Bernard Neal say they were "going out and pick up some young ladies." Mays remained at the apartment longer than the others and then left to go to his sister's house. He walked to Graymont Avenue in the direction of Legion Field. As Mays passed a "U-Tote-M" store, he saw a man push a young woman into an automobile. He could not identify the race of either person. However, he did identify the automobile as belonging to Jones.
Edward Lynn, a student at Daniel Payne College and fraternity brother of appellant and Neal, testified that around 9:30 p.m. on December 20, 1976, he received a call from appellant requesting that he pick him up at a convenience store located on the corner of Cherry Avenue and Highway 78 in Birmingham. Lynn drove to the store and saw appellant, Jones, and Neal. He noticed the clothes of Jones and Neal had spots of blood in the chest portion. Appellant's clothes were not rumpled and had no blood on them. Appellant told Lynn that Jones and Neal had gotten into a fight. Lynn drove the trio to Jones's apartment.
Hoover police evidence technician L.E. Strickland testified that on December 21, 1976, he was called to a location about three-quarters of a mile from the intersection of Cherry Avenue and Highway 78 to examine the victim's automobile. He photographed the scene and had the car towed to the city shop where he processed it for evidence. Strickland recovered from the car: (1) two spent .22 caliber shells found near the left front door; (2) one spent .22 caliber shell found on the right front floorboard; (3) one lead bullet recovered from the "hat rack" area of the rear seat; (4) a reddish colored stain removed from the right rear quarter panel; (5) a blue skirt which was found lying partially on the right front floorboard; (6) a piece of seat cover removed from the upper right front seat area; and (7) eleven latent fingerprints. The shells and projectile were turned over to Higgins. The clothes were placed in the trunk of Strickland's car and removed by evidence technician Leonard Robbins the following day; they were then turned over to the Department of Forensic Sciences. The fingerprints were sealed, identified, and placed in the locked depository at the police identification bureau. *Page 210 
On February 10, 1977, Strickland received a Sears portable twelve-inch black and white television, model number 564.50100501, serial number 40204630 from Birmingham police officer Bino Barefield.
Evidence technician Leonard Robbins testified that on December 21, 1976, he went to the location where the victim's body was found and collected seven .22 caliber shells, six spent and one live. He turned them over to Higgins. Robbins collected three pieces of pavement on which reddish stains were found and turned them over to the Department of Forensic Sciences.
Birmingham police officers Jerry McElroy and Myran Bradley testified that on January 28, 1977, they saw appellant in possession of a pistol. They arrested appellant and gave the pistol to evidence technician James Rhodes.
David Higgins, Birmingham police senior evidence technician, testified that on January 29, 1977, he received the .22 caliber pistol previously in the custody of evidence technician Rhodes. Higgins test fired the .22 caliber pistol taken from appellant and compared the projectiles and spent shells with those collected by Strickland, Robbins, and himself. He determined that the six casings found by Robbins at the site of the victim's body and the three casings found by Strickland at the site of the victim's automobile had all been struck by the same firing pin. He also determined that one of the casings found by Robbins had probably been fired from the gun taken from appellant.
Higgins's comparisons of the four projectiles removed from the victim's body revealed that they had been fired from appellant's pistol. He also determined that the projectile found by Strickland in the victim's car was fired from the same gun.
Sandra Triplett, a senior fingerprint technician, determined that the right palm print found on the door glass of the victim's car was appellant's.
In December 1976, Eugene Maddox was a student at Daniel Payne College and was a fraternity brother of appellant. He was living at home. During the Christmas holidays, appellant visited Maddox at his home and brought a television with him. Maddox identified the victim's television as being similar to the one brought by appellant. Appellant left the television with Maddox.
When school reconvened, the television was put in a dormitory room that Maddox and appellant shared. After appellant was arrested, he telephoned Maddox and told him to destroy the television. Maddox told Sammy Mulkey, a resident of the same dormitory, about appellant's telephone call, and Mulkey volunteered to dispose of the television. Maddox left his dormitory room and upon his return, the television was gone. He did not see it again until appellant's trial. Maddox also identified the gun taken from appellant by Bradley as belonging to appellant.
Sammy Mulkey testified that he took the television from Maddox's room. He identified the television recovered by Barefield as the set which he had received from Maddox. Mulkey took the television to his parents' home in Clanton where he kept it for three or four days until contacted by Clanton police officer William Petty. Petty testified that he recovered the television from Mulkey. He subsequently gave the television to Birmingham police officer Barefield.
Frank Speigner, manager of the home entertainment department of the Century Plaza Sears store in Birmingham, testified that on August 30, 1976, the victim had purchased a Sears portable television bearing the same model and serial numbers as previously testified to by Strickland. The set used by appellant and Maddox and recovered from Mulkey by Petty and Barefield bore the identical numbers.
Lawden Yates, criminologist with the Department of Forensic Sciences, examined evidence submitted to him by Robbins, Strickland, and Higgins. Yates determined that the reddish stains found on the pavement taken from the site of the victim's body were human blood. He determined that a stain on the piece of seat cover submitted by Strickland was human semen. *Page 211 
Yates found the reddish stain removed from the right rear quarter panel of the victim's car to be blood. He test fired appellant's pistol and compared the projectiles with those removed from the victim. Yates concluded that the bullets removed from the victim had been fired from the pistol taken from appellant. Examination of the victim's skirt revealed no defects or unusual features of any type. Other articles of clothing belonging to the victim were found to have blood stains on them.
Yates's testimony concluded presentation of the State's case. Appellant moved to exclude the State's evidence on the basis of its failure to prove a prima facie case. The motion was denied. Appellant then rested his case without presenting any evidence.
 I
The Alabama Death Penalty Act is constitutional. Raines v.State, 429 So.2d 1111 (Ala. 1982); Beck v. State, supra.
 II
Appellant contends that the State failed to prove the element of robbery as required under § 13-11-2 (a)(2). He submits that "no evidence was offered as to how or when the T.V. set came into [his] possession. . . ." Appellant argues that "the murder and underlying robbery must have been committed contemporaneously in that a defendant in the course of the robbery must have committed the offense of murder." Thus, he asserts that "it is left to speculation as to how the T.V. set came to be in [his] possession. . . ."
The facts clearly establish that the television was in the victim's car on December 20 when she left her fiance's fraternity house to go to the store. It was reasonable for the jury to infer from the facts that the television was not in her car when it was initially found and later examined by Strickland on the morning of December 21. The victim's body and automobile were found in close proximity to Daniel Payne College. Mays overheard plans being made by appellant, Jones, and Neal to pick up some ladies. He later saw a man forcing a woman into a car parked at a convenience store located a short distance from the Birmingham-Southern College campus. Mays observed the car leave the store parking lot followed by Jones's car. A few hours later, the trio was picked up a short distance from the victim's car and Daniel Payne College by Lynn. Lynn noticed the bloody and rumpled condition of Jones's and Neal's clothes. A few days later, appellant left the television with Maddox. Upon returning to school, appellant and Maddox used the television in their dormitory room. Sometime after his arrest, appellant called Maddox and told him to dispose of the television. Appellant's palm print was found on the victim's car. When arrested, appellant had in his possession the pistol that was identified at trial as being the murder weapon.
In Clements v. State, 370 So.2d 708, 713 (Ala.Cr.App. 1978),rev'd on other grounds, 370 So.2d 723 (Ala. 1979),[2] we addressed the same issue adversely to appellant. We stated:
 "First, the appellant asserts that there was no evidence presented by the State which established that anything was taken from Mrs. Ford before she died. In Cobern v. State, 273 Ala. 547, 142 So.2d 869
(1962), the Alabama Supreme Court held that the fact that the victim was dead at the time the property was taken would not militate the crime of robbery if the intervening time between the murder and the taking formed a continuous chain of events. See also Barker v. State, Ala.Cr.App., 344 So.2d 547 (1977). In the instant case the intervening time, if any there be, formed a continuous chain of events."
See also Beverly v. State, 439 So.2d 758 (Ala.Cr.App. 1983). *Page 212 
"While the violence or intimidation must precede or be concomitant with the taking, it is immaterial that the victim is dead when the theft occurs. For purposes of the common-law definition [of robbery], a corpse is a `person' if `the taking occurs minutes after the victim is killed.'" Whitley v.Commonwealth, 223 Va. 66, 286 S.E.2d 162, 166 (1982). See alsoO'Pry v. State, 642 S.W.2d 748 (Tex.Cr.App. 1981).
Between 6:30 p.m. and 9:30 p.m. on December 20, 1976, appellant and his cohorts robbed and intentionally killed Quenette Shehane. The intervening time, if any, between the killing and robbery was a part of a continuous chain of events. To sustain appellant's position would be tantamount to granting to would-be robbers a license to kill their victims prior to robbing them in the hope of avoiding prosecution under the capital felony statute.
After a careful review of the State's evidence, Dolvin v.State, 391 So.2d 133 (Ala. 1980); Cumbo v. State, 368 So.2d 871
(Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979), we find it sufficient to establish a prima facie case of robbery when the victim is intentionally killed. It amply supports the verdict of the jury finding appellant guilty.
 III
Appellant contends that the trial court erred during the jury sentencing phase by allowing the jury to continue its punishment deliberations when, after about two hours of deliberation, it had not unanimously reached a decision.
Immediately after receiving the jury's verdict as to appellant's guilt, the trial court proceeded into the jury sentencing phase of the trial. Upon agreement of both parties, a lunch recess was had with the jury reassembling at 2 p.m. At that point, arguments by the State and counsel for appellant were received. The trial court gave a lengthy instruction to the jury and then sent it to deliberate. Later that afternoon, apparently near the time for the evening recess, the following occurred:
 "THE COURT: Ms. Cunningham, does the jury have a report they would like to make to me? Do not tell me how you are split if there is a numerical division in your number.
"MS. CUNNINGHAM: Yes, it is.
 "THE COURT: Okay. We have spent the better part of two days trying this case. Witnesses have been brought in and told everything there is to be told about this case. The lawyers have done a fine job in presenting both sides of the case to you. Under the circumstances I'm going to recess you until 8:30 in the morning. Let's make it 9:00 in the morning. I have a docket to call. And let y'all come back in fresh and try your deliberation again. I feel two hours is too short a time deliberation to call a hung jury.
". . .
"THE COURT: Do y'all have any exceptions?
"MR. HULTQUIST: No exceptions.
"MR. BARBER: No exceptions."
The following morning, appellant moved "that the jury not be allowed to continue with their deliberations" and that he be sentenced under Beck v. State, to life imprisonment without parole. In support thereof, appellant argued that the previous afternoon the jury had stated to the trial court that it could not reach a decision as to a sentence recommendation and, thus, his request was proper under the guidelines of Beck v. State.
The trial court denied appellant's motion, stating:
 "What I intend to do though, is to call the jury in and ask them and instruct them what the law is that if they cannot unanimously agree upon a penalty of death by electrocution, then out of necessity under Beck, the proper verdict for them to return would be life imprisonment without parole."
The above additional instruction was in accord with a request by appellant. The jury was reassembled with the following transpiring: *Page 213 
 "THE COURT: Ladies and gentlemen of the jury, I hope y'all had a pleasant evening and are rested. When I told you I wanted you to deliberate further, I am not trying to force you to get a verdict. There's one thing I feel like that y'all might not have understood from my previous charge to you and I want to make this clear to you.
 "If the jury cannot agree on a unanimous sentence of death as the punishment, the alternative form of, we, the jury, find the punishment life imprisonment without parole would be what you would return. Did y'all understand that previously?
"JUROR: No, sir.
 "THE COURT: So, you have two possible forms you may return. One, is the death verdict form I have given you. If you cannot agree on that unanimously, then your verdict would be the life imprisonment without parole.
 "Do you have any questions or anything further I might be able to assist you in, in your deliberations at this time?
"(Indicating no.)
"THE COURT: Thank you.
"(Jury out for further deliberation.)"
There was nothing coercive in the trial court's action in having the jury continue its deliberations.
 "It is quite clear that under Alabama law a trial judge may urge a jury to resume deliberations and cultivate a spirit of harmony so as to reach a verdict, as long as the court does not suggest which way the verdict should be returned and no duress or coercion is used." (Citations omitted.) Showers v. State, 407 So.2d 169, 171 (Ala. 1981).
See also Galloway v. State, 416 So.2d 1103 (Ala.Cr.App. 1982), and Hankins v. State, 25 Ala. App. 504, 150 So. 708, cert.denied, 227 Ala. 454, 150 So. 709 (1933) (where the jury deliberation had continued for over one day before the trial court urged it to reach a verdict).
We find nothing coercive or intimidating about the trial court's additional instruction to the jury. It was fully within its discretion to have the jury continue its deliberations, especially since the jury had deliberated for only a short period of time prior to the evening recess. To have the jury resume its discussions the next morning in no way forced the jury to recommend death as appellant's punishment. Contrary to appellant's assertion at trial, the record does not reflect any statement by the jury that it could not reach a decision as to his punishment. Consequently, we find no merit in appellant's contention.
 IV
Appellant asserts that the trial court improperly considered non-statutory aggravating circumstances in its sentencing hearing. In essence, appellant argues that the findings of fact by the trial court negating the mitigating circumstance enumerated in § 13-11-7 (4), Code of Alabama 1975, amounts to an impermissible consideration of a non-statutory aggravating circumstance. Appellant's contention is factually without merit.
A review of the attached order of the trial court reveals that it carefully considered each aggravating and mitigating circumstance enumerated in §§ 13-11-6, -7. It properly found to exist two aggravating circumstances, that the capital felony was committed while the defendant was engaged in the commission of a robbery, and that the capital felony was especially heinous, atrocious or cruel. § 13-11-6 (4), (8). See generallyKyzer v. State, 399 So.2d 330 (Ala. 1981); Dunkins v. State,437 So.2d 1349 (Ala.Cr.App. 1983). The trial court found the § 13-11-7 (1) mitigating circumstance to exist. In particular, it made specific findings of fact in order to provide for proper appellate review, § 13-11-4, disproving any existence of the § 13-11-7 (4) mitigating circumstance. We do not find that the trial court included the facts negating § 13-11-7 (4), or relied upon them as a non-statutory aggravating circumstance. See e.g., Whisenhant v. State, [Ms. 1 Div. 333, Nov. 23, 1982] (Ala.Cr.App. 1982). The trial court adhered to the safe practice of following the statute in negating the mitigating circumstances and further, under § 13-11-4, listed specific facts to support the negation of *Page 214 
§ 13-11-7 (4). This procedure does no injustice to the substantial rights of appellant and does not constitute error.
 V
In accordance with the guidelines of Beck, 396 So.2d 645,664, we find that appellant's death sentence: (1) was not imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) the evidence fully supported the trial court's finding of the statutory aggravating circumstances listed in its written order;[3] and (3) the sentence was not excessive or disproportionate in relation to the penalty imposed in similar cases, considering both the crime and the defendant.
In particular, the instant offense was properly punishable by death. § 13-11-2 (a)(2), Code of Alabama 1975. Similar crimes are being punished by death. See Raines, supra; Luke v. State,444 So.2d 393 (Ala.Cr.App. 1983); Womack v. State,435 So.2d 754 (Ala.Cr.App. 1983); Coulter, supra; Bush v. State,431 So.2d 555 (Ala.Cr.App. 1982).
We have compared the sentences received by Neal, Jones, and appellant,[4] and find appellant's sentence of death appropriate under the facts and circumstances of the instant cause. The facts lead to the reasonable conclusion that appellant was the triggerman of the instant killing. This can be drawn from the facts that: (1) appellant was president of his fraternity of which Neal was a member and Jones had previously been a pledge; (2) appellant's clothing showed no trace of blood or recent struggle when picked up by Lynn; (3) when arrested, he had the murder weapon in his possession; and (4) the victim's television was clearly traced to him.[5]
In Williams v. State, 461 So.2d 834 (Ala.Cr.App. 1983), this court, in addressing the identical issue, stated:
 "While Beck, 396 So.2d at 644, obligates this Court to consider the punishment received by alleged accomplices, it does not require or direct that every defendant implicated in a crime receive the same punishment. . . .
 "The one fact that the defendant was the `triggerman' is sufficient to distinguish him from the others for purposes of the death penalty. [State v.] Shaw, [273 S.C. 194], 255 S.E.2d [799] at 804. See also Justus [v. State, 247 Ga. 276], 276 S.E.2d [242] at 245; McClesky [v. State, 245 Ga. 108], 263 S.E.2d [146] at 151. . . ."
In the instant case, the aggravating circumstances "remarkably and exceedingly outweigh the mitigating circumstances. . . ." Dunkins, supra. We therefore concur in and affirm the findings of the jury and the trial court that death is the appropriate sentence. "Indeed, applying the laws of this state and nation to the particular facts of this case, we do not see how any other penalty is justified." Id.
We have searched the record for error prejudicial to the substantial rights of appellant and have found none. A.R.A.P. 45A. The judgment of the circuit court is hereby affirmed.
AFFIRMED.
All the Judges concur.
[1] The trial court's written findings of facts are hereby attached to this opinion as Appendix A.
[2] See also Clements v. State, 390 So.2d 1131 (Ala.Cr.App.), cert. denied, 390 So.2d 1136 (Ala. 1980).
[3] The trial court excluded evidence of felony convictions of appellant obtained after commission of the capital offense. At its sentencing hearing, the trial court could have considered such and, thus, found the aggravating circumstance listed in § 13-11-6 (2) to have existed. Coulter v. State, 438 So.2d 336
(Ala.Cr.App. 1982).
[4] Neal received a sentence of life imprisonment without parole,Neal v. State, 372 So.2d 1331 (Ala.Cr.App.), cert. denied,372 So.2d 1348 (Ala. 1979), and Jones received a sentence of life imprisonment, Jones v. State, CC 77-625 [6 Div. 849, notice of appeal filed, Mar. 4, 1982].
[5] See generally, Jones's confession reported in Neal, 372 So.2d at 1346.
 APPENDIX A STATE OF ALABAMA v. WALLACE NORRELL THOMAS CASE NO. CC-77-1503 ORDER
The Court, having conducted a hearing pursuant to Title 13-11-6 of the Code of *Page 215 
Alabama to determine whether or not the Court will sentence Wallace Norrell Thomas to death or to life imprisonment without parole, and the Court having considered the evidence presented at the trial and at said sentencing hearing, the Court makes the following findings of fact:
The Court first considers the aggravating circumstances as outlined and described in Title 13-11-6.
(1) The Court finds that the capital offense was committed by Wallace Norrell Thomas while he was committing a robbery wherein the victim was intentionally killed by the Defendant. However, the Defendant, Wallace Norrell Thomas, was not under a sentence of imprisonment at the time;
(2) The Court finds no evidence that Mr. Thomas was previously convicted of another capital offense or another felony involving the use or threat of violence to the person;
(3) The Court finds that there is no evidence that the Defendant did knowingly create a great risk of death to many persons;
(4) The Court finds the capital offense was committed while the Defendant was engaged in the commission of a robbery;
(5) The Court finds the capital offense was not committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;
(6) The Court finds that the capital offense was not committed for pecuniary gain;
(7) The Court finds the capital offense was not committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws;
(8) The Court finds the facts to be that the nude body of the victim, Quenette Shehane, was found in a wooded area during an extremely cold period. Her body bore the signs of trauma in that there were numerous abrasions, bruises, scratches and gunshot wounds. It was determined that the victim had been shot with a .22 caliber pistol one time in the chest, three times in the buttocks, and two times in the left elbow. The above mentioned abrasions being found on her chest, abdomen and lower extremities. The victim's clothes did not have bullet holes in them, indicating that she was nude at the time she was shot. The Court finds that the killing of Quenette Shehane was outrageous and extremely wicked, vile and shockingly evil. The Court finds from the evidence that the victim was abused and tortured prior to her death. It is, therefore, the opinion of this Court that the Capital offense was especially heinous, atrocious or cruel compared to other capital offenses.
The Court finds beyond a reasonable doubt and to a moral certainty that the aggravating circumstances described in Title 13-11-6 and set out hereinabove in subparagraphs (4) and (8) apply to the Defendant, Wallace Norrell Thomas, in this case.
The Court now considers the mitigating circumstances as described and set out in Title 13-11-7, Code of Alabama.
(1) The Court finds that Mr. Thomas has no significant history of prior criminal activity;
(2) The Court finds that the capital offense itself was not committed while Mr. Thomas was under the influence of extreme mental or emotional disturbance;
(3) The Court finds that the victim was not a participant in Mr. Thomas' conduct and did not consent to the act.
(4) The Court finds that the Defendant was a leader as evidenced by his having been President of his college fraternity at the time the capital offense was committed. The Court finds that on January 28, 1977 when Mr. Thomas was arrested while committing another robbery that he had in his possession a .22 caliber pistol, which was determined at a later date to be the pistol from which the bullets removed from the victim's body had been fired. In addition, the Court further finds that the television which was the item taken during the robbery of the victim was in the actual or constructive possession of the Defendant. Therefore, the Court does not find that the Defendant was an accomplice in the capital *Page 216 
offense committed by another person or that his particular participation was relatively minor. In fact, the Court finds the Defendant committed the robbery and the intentional killing;
(5) The Court finds that Mr. Thomas did not act under extreme duress or under the substantial domination of another person;
(6) The Court finds that the capacity of Mr. Thomas to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not substantially impaired;
(7) The Court finds that Mr. Thomas was twenty-two years of age at the time this capital offense was committed, but the Court finds his age is not a mitigating circumstance.
The Court having considered the statutory mitigating circumstances and, in addition, having listened to and having considered all the non-statutory mitigating circumstances, presented by the Defendant's attorney, the Court is convinced beyond a reasonable doubt and to a moral certainty and it is the judgment of the Court that the aggravating circumstances far outweigh the mitigating circumstances outlined hereinabove by itself and even when considered independently is sufficient to outweigh the mitigating circumstances beyond a reasonable doubt and to a moral certainty to justify fixing the punishment at death. Therefore, it is the judgment of this Court that the death penalty as fixed by the jury should be and is hereby accepted.
It is therefore considered and adjudged by the Court that Wallace Norrell Thomas is guilty of the capital offense charged in the indictment and specifically of intentionally killing Quenette Shehane during the course of a robbery of said Quenette Shehane, deceased.
It is therefore ORDERED, ADJUDGED AND DECREED that you, Wallace Norrell Thomas, suffer death by electrocution at any time before the hour of sunrise on the 7th day of October, 1982, inside the walls of the William C. Holman Unit of the Prison System at Atmore, Alabama, in a room arranged for the purpose of electrocuting convicts sentenced to death by electrocution.
It is therefore further ORDERED, ADJUDGED AND DECREED by the Court that the Warden of William C. Holman Unit of the Prison System at Atmore, or in the case of his death, disability or absence, his Deputy, or in the event of the death, disability or absence of both the Warden and his Deputy, then the person designated as Administrator by law for such purpose, at any time before the hour of sunrise shall on the 7th day of October, 1982, inside the walls of the William C. Holman Unit of the Prison System at Atmore, in a room arranged for the purpose of electrocuting convicts sentenced to death by electrocution, cause to pass through the body of the said Wallace Norrell Thomas, a current of electricity of sufficient intensity to cause his death, and the continual application of such current through the body of the said Wallace Norrell Thomas until the said Wallace Norrell Thomas be dead, and may Almighty God have mercy on Your Soul.
ORDERED this 9th day of July, 1982.
 s/ Robert L. Byrd, Jr.
Robert L. Byrd, Jr.